LOUISE M. OWENS, Plaintiff, *v.* HARRY E. OWENS, Defendant.

Supreme Court, Oneida County, November 28, 1932.

*S. J. Capacelatro*, for the plaintiff.

*Samuel L. Simons*, for the defendant.

DOWLING, J.   The parties were married May 16, 1923, at Utica, N. Y.   December 3, 1924, a child, Doris Vivian Owens, was born. The marriage proved to be an unhappy one.   After the daughter was born, defendant abandoned plaintiff and said child and went to Pennsylvania.   He was indicted by a grand jury of Oneida county on a charge of abandonment and was brought to the city of Utica, arraigned in County Court and was released on $1,500 bail, upon promising to care for his wife and child.   This he did not do eventually.   Whereupon, the plaintiff brought him into the Children's Court of Oneida county, and after a prolonged trial, and on or about January 18, 1928, he was ordered to pay twelve dollars per week to her and child for their support and maintenance.

On June 13, 1932, while plaintiff was walking down Charlotte street, Utica, a man, whom she claims she had never seen before, called to her by name, saying that he had a tip for her.   She stopped and engaged in conversation with him.   He said his name was Henry; that he was familiar with the matrimonial troubles existing between her and her husband; that " he worked for Mr. Arthur, attorney; " that he had sufficient evidence for plaintiff to procure a divorce from her husband as he had found his wife and defendant's husband together in a camp at Canadarago lake.   He asked plaintiff to permit him to " straighten out the difficulties under which she was then laboring."   Within a week after this meeting, Henry took plaintiff to Canadarago lake and showed her a cottage where he claimed to have seen his wife with her husband.

Plaintiff claims that on June 24, 1932, Henry and Miss Erma Kunkle, Mr. Arthur's secretary, visited her at her home, without appointment; that they had with them a proposed agreement between herself and her husband and summons and complaint in the above action, which Henry told plaintiff to sign, saying that if she did not, she would never see her child again, whereupon she verified the complaint and signed said agreement in language as follows:

### "AGREEMENT

" Made this 24th day of June, 1932, by and between Louise M. Owens, party of the first part, and Harry E. Owens, party of the second part, as follows:

" WHEREAS, the parties hereto are husband and wife, although they have not been living together as such for more than four years last past, and

" WHEREAS, there was born as issue of the marriage of the parties hereto one child, Doris V. Owens, born December 3, 1924, and which child, since the parting of the parties hereto, has been with

the party of the first part hereto part of the time and with the party of the second part hereto part of the time.

"Now, therefore, for and in consideration of the sum of One Dollar ($1.00) paid by each of the parties hereto to the other, receipt whereof is hereby acknowledged, it is hereby covenanted and agreed by and between the parties hereto as follows: That the said Harry E. Owens shall have the custody and control of said child, Doris V. Owens, subject to the full right and privilege of said Louise M. Owens, party of the first part hereto, to see said child at all reasonable times and occasions, and this arrangement and agreement is made upon the condition and with the understanding that said child shall be properly cared for, supported and maintained by said Harry E. Owens at all times, and this arrangement shall constitute the final and complete settlement and adjustment of the legal rights and equities of the parties hereto as of property and business matter upon the payment by the party of the second part hereto to the party of the first part hereto of the sum of $20.00, the same being the agreed amount in which he is in arrears on payments to be made by him to party of the first part in connection with past obligations for support of said child and all proceedings against him in Children's Court or elsewhere pertaining to the custody and support of said child is hereby requested on the part of the party of the first part hereto to be withdrawn and discontinued, and this shall constitute a complete settlement of all matters between the parties hereto to date.

"This agreement to bind the heirs, executors, administrators and assigns of the respective parties.

"Signed, sealed and delivered the day and year first above written.
"LOUISE M. OWENS [L. s.]
"HARRY E. OWENS. [L. s.]"

That in consideration of her signing the agreement, defendant paid her twenty dollars.

On June 24, 1932, Miss Kunkle served the summons and complaint on the defendant at Mr. Arthur's office. Edward L. Smith, of Utica, appeared for defendant and interposed an unverified answer for him, presumably on June 30, 1932, as on that date the attorneys for the respective parties herein entered into a written stipulation for the appointment of a referee to hear, try and determine the issues raised by said answer. June 30, 1932, upon application of the plaintiff's attorney, the action was referred to Hon. JOSEPH D. SENN, of Oneida, N. Y., as official referee.

On June 30, 1932, Henry visited plaintiff and informed her that he would take her to Wampsville the following day for the trial of her said action.

July 1, 1932, Henry and Mr. Arthur called for plaintiff and took her in Henry's car to Wampsville.

Plaintiff testified on this motion that she had never met Mr. Arthur prior to this occasion, had never been in his office, had never retained him as her attorney in this action and had never consulted him about the above agreement.

Before the case was brought to trial before Judge SENN, plaintiff swears that Henry told her that she should testify that she desired the defendant to have the custody of the child; " that such an affirmative answer was requested in order than the Court might adjudicate the further custody of her said daughter;" that after the divorce was obtained her daughter would be returned to her. Neither defendant nor his attorney appeared at the trial.

The matter came to trial before Judge SENN. Henry and Nettie Starkweather were produced before him and testified to the defendant's adultery, at Canadarago lake with a woman unknown, about August 8, 1931. Plaintiff testified as follows: " Q. And if the Court sees fit to grant you a decree of divorce is it satisfactory to you that Mr. Owens support and care for this child at his home, or at his mother's home, or such other place as is reasonable and proper, he providing for such support with the right and privilege to you, at any and all times, of seeing and visiting the said child? A. Yes. The Court: Until further order of the Court. Q. You expect to leave the City of Utica, at least, for some time, shortly? A. Yes. Q. And establish your residence elsewhere? A. Yes."

On July 7, 1932, Judge SENN made his decision in writing wherein he found the defendant guilty of adultery committed on the 8th of August, 1931, at a camp, or cottage, at or near Canadarago lake, Otsego county, N. Y. On July 19, 1932, an interlocutory decree of divorce, approved as to form and substance by Judge SENN, was docketed in Oneida county clerk's office. Said interlocutory decree contained the following provision:

" Ordered, adjudged and decreed, that because of the particular circumstances surrounding this case, the custody of said child, Doris V. Owens, born December 3, 1924, is hereby awarded to the defendant who shall continue to maintain said child at his mother's home, or such other place as shall be proper, and shall provide the means for the care of said child wherever she shall be so maintained by him, with the right and privilege to the plaintiff of seeing said child at any and all reasonable times and occasions."

Judge SENN was not informed by any one of the part Henry had played in the institution of this action, nor was he informed of the fact that plaintiff had signed the above agreement, surrendering her daughter to her husband and waiving the twelve dollars a

week which she was receiving from him for the support of herself and child, nor was Judge Senn informed of the fact that, in several divorce cases wherein Mr. Arthur represented the plaintiffs, theretofore tried, Henry and sometimes his wife had been witnesses for the plaintiffs; that all of said actions had practically the same setting as the instant case.

After the signing of the above agreement, defendant procured the custody of said child and ceased his weekly payments to plaintiff.

After the trial before Judge Senn, the plaintiff, in company with said Henry and another couple, visited her sister in Washington, D. C., and remained there for a period of ten days, after which she returned to Utica.

Plaintiff testified she never employed Mr. Arthur and never paid him anything. Mr. Arthur testified that the defendant's mother gave him $100, which, undoubtedly, came from the defendant. Plaintiff never received a copy of the interlocutory decree.

On the 5th of October, 1932, plaintiff procured an order directing the defendant to show cause why the above interlocutory decree should not be vacated upon the ground of " fraud, perjury and collusion " practiced upon her by the defendant and his agents. Upon the return of said order, defendant appeared specially and objected to the jurisdiction of the court upon the ground that the relief sought could be given only by the official referee who granted the interlocutory decree herein as provided in section 116 of the Judiciary Law, which is as follows: "As to all *ex parte* motions and motions, actions or proceedings submitted to said referee by stipulation of the parties appearing therein, or order of the court, except matrimonial actions, the same shall be deemed duly referred to said official referee and, in addition to all the powers now conferred by section four hundred and sixty-nine of the civil practice act, he shall proceed therein with the same power and authority as a justice presiding at a regular special term of the supreme court and entertain and grant motions for new trial, grant stays and orders to show cause; and similar jurisdiction and authority as to any other action or proceeding referred to him by order of the supreme court including matrimonial actions."

Section 469 of the Civil Practice Act provides: " General powers of a referee. The trial, by a referee, of an issue of fact, must be brought on upon like notice and conducted in like manner as where the trial is by the court without a jury. The referee exercises, upon such a trial, the same powers as the court, to grant adjournments, to preserve order, and punish a violation thereof, or to subpœna a witness to attend before him and in a proper case to bring with him a book, document or other paper. * * * The powers con-

ferred by this section are exercised in like manner and upon like terms as similar powers are exercised by the court upon a trial."

Section 1176 of the Civil Practice Act provides: " Final judgment in action to annul a marriage or for divorce. Three months after the entry of the interlocutory judgment in an action brought for judgment annulling a marriage or divorcing the parties and dissolving a marriage such interlocutory judgment shall become the final judgment as of course unless the decision of the court or report of the referee shall require and the interlocutory judgment shall provide for the entry of final judgment or unless for sufficient cause the court in the meantime shall have otherwise ordered."

Section 116 of the Judiciary Law was designed to enlarge the powers of official referees in all actions, motions and proceedings, except matrimonial actions, coming to them by stipulation of the parties or order of the court, so that they could " entertain and grant motions for a new trial, grant stays and orders to show cause."

In matrimonial actions it was not the intention of the Legislature to empower official referees to hear or entertain motions involving, as they might, the custody of children, awarding of counsel fees and alimony, serving of amended and supplemental pleadings, amending, modifying or vacating interlocutory or final decrees. It was the obvious intent of the Legislature, due to the interest of the State in the marriage contract, to continue the control of matrimonial litigation in the Supreme Court. This brings up for interpretation the following clause of section 116 of the Judiciary Law, as above quoted: *"And similar jurisdiction and authority as to any other action or proceeding referred to him by order of the supreme court including matrimonial actions."* On superficial examination, one might conclude that it was the intention of the Legislature, in enacting this clause, to confer on official referees the same power in matrimonial actions as is given to them in other actions by the first clause of section 116, as above quoted. Such is not the fact. There is no inconsistency between the two clauses. They harmonize perfectly. Where a matrimonial action is sent to an official referee to hear and determine, under the first clause of section 116, his power is limited to hearing and determining the issues and making his report thereon, including his findings. The interlocutory and final decrees in such cases are signed by the clerk of the court. After the official referee has made his report and the interlocutory or final decree has been entered, if either of the parties desires to modify or vacate the same, or to obtain any relief not therein provided, such party must apply to the Supreme Court, and it is then that the second clause of section 116 comes into play.

The Supreme Court, in such event, may entertain such application or it may refer the same to the official referee by its own order and, in that event, the official referee has the same power as the court to decide the matters so referred to him, but the Supreme Court is not obliged to refer such an application to an official referee. The court might refer such an application to an official referee in a case tried before the court or some referee other than himself.

Giving such interpretation to section 116 avoids conflict between its provisions and the provisions of section 1176 of the Civil Practice Act, which provides, in substance, that the interlocutory judgment shall become final as of course unless " the court in the meantime shall have otherwise ordered." All applications for such relief must be made in the first instance to the court.

Giving such effect to section 116 of the Judiciary Law, one must conclude that the defendant's preliminary objection is not available and must be overruled.

In view of the fact that this motion has been thoroughly argued before this court and 231 pages of testimony have been taken in order that the court might be better informed as to the real facts, I am of the opinion that it would be unfair to send the matter to Judge SENN and compel him to duplicate the work already done.

It is clear from the evidence and the moving papers that the plaintiff was duped by the defendant, acting through his agent, Henry, into bringing this action, surrendering her child and releasing her support, and that a fraud has been committed upon the court.

Obviously, the plaintiff has not told the whole truth in respect to her dealings with Henry. No doubt, Henry wormed his way into her confidence. No doubt, he suggested the institution of this action; no doubt, he framed the testimony upon which the interlocutory decree of divorce was obtained; no doubt, he was acting for the defendant at all times; no doubt, he retained counsel for plaintiff at defendant's expense; no doubt, he told plaintiff that he, Henry, had instituted divorce proceedings against his wife. Thus far, the trail is distinct.

I am unable to believe, however, that the plaintiff instituted this action because she feared that, unless she did, she would never see her child again. She knew better than that. The rational inference from the evidence and the moving papers is that Henry promised plaintiff that, if they divorced their respective mates, he would marry and care for her and it would be best for both of them to allow the defendant to have the custody of the child. This inference is strengthened by the fact that she and Henry departed for Washington, D. C., shortly after the hearing before Judge

SENN and remained away for a period of ten days. When she returned, she discovered that Henry had not commenced an action for divorce and did not intend to commence such an action. It was then she realized that she had been tricked and deceived. Whether she was coerced, as claimed by her, or duped, the result is the same and, in either event, fraud upon the court was committed.

Plaintiff's counsel failed to inform the court of the above agreement, of how the case came to him, of who was to pay him, of the interest of Henry in the action, of Henry's record as a professional witness in similar divorce cases. All this, and more, was kept from the ear of the court. Such an explanation might have cast suspicion on the evidence offered in behalf of the plaintiff and might have influenced the learned official referee in his decision.

Defendant was not represented upon the trial. He opposes the motion to set aside the interlocutory decree which brands him as an adulterer. He values his release from matrimonial responsibilities more than his good name, an unusual attitude indeed. To be sure, if the interlocutory decree stands and becomes final, he will have the custody of his daughter and will be freed from paying any more tribute to his former wife. Rare indeed is the occasion when the law will permit an unrepentant adulterer to cast the mould in which the virtue of an innocent child shall be fashioned, by giving to him her custody. The record presents no such occasion.

There is sufficient cause to warrant this court in vacating the interlocutory decree granted herein. (*McVickar* v. *McVickar*, 123 Misc. 644; *Kahn* v. *Kahn*, 126 id. 44; *Tanner* v. *Tanner*, 217 App. Div. 803; *Beauley* v. *Beauley*, 190 N. Y. Supp. 129; Civ. Prac. Act, § 1176.)

That the defendant was the prime mover in having this action begun is apparent from his letter to the plaintiff of December 6, 1931, wherein he importuned her to divorce him, concluding his letter thus: " Please understand, Louise, I'm asking you in a decent way if you will consider the whole thing out, take your choice and if you want to start let me know and I'll fix things up for you. I'll make arrangements with a lawyer for you. But please don't forget its coming anyway either pleasant and easy or hard and nasty. It all depends on you.

" You get me on the phone or by return mail if you would please speed it up I'd be grateful."

Although plaintiff is partly to blame for creating the situation in which she now finds herself, it is proper for her to come contritely before the court and disclose the fraud practiced upon it and her part therein. For this she is not to be penalized.

Defendant insists on retaining the fruits of his wrongdoing by opposing this motion. Plaintiff's attorney in the divorce case abets him in his effort to preserve the fruits of his duplicity, an unusual position to say the least.

Neither party has produced Henry or Mrs. Starkweather upon this hearing. No affidavits from them are seen. Why? The answer is obvious.

Motion to vacate said interlocutory decree is granted, with costs and disbursements.

Ordered accordingly.